361 So.2d 1384 (1978)
J.D. ABSTON
v.
STATE of Mississippi.
No. 50515.
Supreme Court of Mississippi.
September 13, 1978.
Cumbest & Cumbest, Fielding L. Wright, Jr., James H. Heidelberg, Pascagoula, for appellant.
A.F. Summer, Atty.Gen., by Wayne Snuggs, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before PATTERSON, C.J., and BROOM and LEE, JJ.
*1385 PATTERSON, Chief Justice, for the Court:
J.D. Abston appeals from a conviction of murder and sentence of life imprisonment by the Circuit Court of Jackson County.
Appellant was indicted for murdering his ex-wife who was living with him and their four children at the time of her demise. Katherine Abston and the appellant were married for approximately fourteen years when they were divorced in 1968 and thereafter lived apart with the appellant caring for and supporting the children. In September 1975 she returned and resided in the Abston home in Gautier, Mississippi.
On the evening of July 24, 1976, Abston and his ex-wife quarreled and a vicious struggle ensued between them. During the course of the affray, the weapons at hand were used, including a knife, "coke" bottle, hammer, meat saw, razor and "grease gun." The appellant directed the children, who were either observing or in the way of the struggle, to move to another room and he *1386 himself left through the back door. After waiting outside for some ten or twelve minutes, Abston reentered armed with a "grease gun" which he thought would frighten his ex-wife. Instead, according to him, she attacked him with a broken knife and he responded by striking her on the head with the "grease gun" and then with a meat saw he had obtained. Ultimately, the battle climaxed in the bathroom which the appellant had entered, according to his version, to tend a wound he had received from a knife wielded by his ex-wife when she followed and attacked him with something "shiny;" whereupon he pushed her backward and she fell into the tub and moved no more.
Mary Abston, the fourteen-year-old daughter of the couple, testified she was unaware who started the fatal fight although she did observe her father strike her mother with a glass, coke bottle, meat saw, and finally, the "grease gun" in the bathroom. At one time, she stated, her mother, bleeding from the head, came out of the bathroom and was later heard to call for help. She never saw her mother or father with a knife or razor blade in their hands. Regina, the thirteen-year-old daughter, also testified to the violence visited upon her mother by her father.
Casey Carr, a friend of the appellant, entered the Abston house that night but left after hearing loud noises. He returned to see the victim in the bathroom and it appeared to him that something was sticking from her head although he was unable to describe it. He testified that he saw the appellant enter the house with the "grease gun," go into the bathroom, close the door and heard Mrs. Abston say she "wasn't going to do it no more."
On July 27, 1976, the Jackson County Sheriff's Department first investigated a report that Katherine Abston was missing. Jackie Walker of that office talked with Abston that day after administering the Miranda warnings and explaining a "waiver of rights" form which the appellant signed. The following day several officers went to the Abston residence with a search warrant to collect evidence. Detective Cox testified he interrogated the appellant but ceased questioning when Abston asked for an attorney as well as indicated he wanted to talk to Assistant Sheriff Kennedy.
Although the testimony is confusing, it is apparent that prior to questioning by Kennedy the appellant asked other officers, and was permitted, to speak by telephone with his attorney, Arvis V. Cumbest, whom Abston beseeched to come talk with him. According to Kennedy, the Miranda "rights" were administered before the interrogation and when Abston requested an attorney, he attempted to reach Cumbest but was unable to do so. Thereafter, according to Kennedy, they continued their conversation. "We just talked in general after he told me that he wanted his attorney and I didn't question him any more after that concerning this. My independent recollection of what we discussed was politics and whatever. I didn't stay in there with him the whole time ... He asked to speak with Mr. Cumbest, his attorney, before he made the statement to me in reference to the location of Katherine Abston." While thus engaged, Kennedy stated Abston volunteered to show him the burial site of his ex-wife and her body was recovered. Although decomposition of the body prevented ascertaining the precise reason for the cause of death, the autopsy did reveal three lacerations upon the forehead.
The following afternoon Abston agreed to give Officers Walker and Cox a statement. Officer Walker testified that the appellant was again advised of his "rights" and executed a waiver after he had it read and explained to him. The tape-recorded and transcribed statement corroborated to a great degree the other testimony concerning the struggle between Abston and his ex-wife, her death and burial. Walker testified that he read the incriminating statement to Abston who understood and signed it on August 9, 1976.
The appellant filed a motion to suppress, contending his statements, including those leading to the body, were inadmissible because they were the result of "threats, *1387 promises, coercion, offer of reward and hope of leniency" and were therefore involuntarily made. He asserted also that he was deprived of counsel in violation of the Sixth Amendment, thereby invalidating both statement and confession.
The state assumed the burden of proof on the motion and offered Officers Cox and Walker as witnesses in opposition to it. The sum of Walker's testimony concerning coercion is that he gave the appellant his Miranda warnings on the first day of the investigation, which were understood by Abston, and discontinued the interrogation when Abston requested an attorney. And, the day after the body was found, he again advised Abston of his Miranda rights in the presence of Detective Cox and subsequently Abston's statement was tape-recorded, transcribed and later signed by Abston. The recorded statement was given without threats or offer of leniency by either Cox or himself and was apparently understood because it was read to Abston and signed by him. This evidence was corroborated by Cox who testified, as did Walker, that Abston's statement concerning the location of the body was given to Assistant Sheriff Kennedy in a separate room and not in their presence.
The appellant and his attorney gave evidence in support of the motion. Abston testified that he requested an attorney after he had been in jail "a couple or so days." He stated that upon being returned to the jail after going with Officers Walker and Cox to his home, Assistant Sheriff Kennedy advised him, while they were alone, that the best thing he could do, if he knew the location of the body, was to show it to him. According to Abston he then requested an attorney and Kennedy responded by telling him Cumbest did not have a home phone and that if he would reveal the whereabouts of the body, he would talk to the judge and "it would go pretty light on him;" whereupon Kennedy was directed to the construction site where the body was buried. The appellant then related that he was unable to read or write, having gone to school for only a very short time.
Attorney Cumbest, who had handled other legal matters for Abston, testified that he received a call from the sheriff's department and talked with Abston by telephone. He stated Abston did not disclose his reason for needing an attorney, but only stated he was worried, scared and needed someone with whom to talk and he replied, "I'll be right there. Give me an hour and I'll be right there." However, upon arriving at the sheriff's office at about 4:30 p.m., and within the hour, he was informed that Abston was not present, "that he had left several minutes ago with Larry Kennedy." Although he drove about in search of Abston, he was not located until approximately 10:30 that night. Cumbest testified: "I did not get to talk to him until the body had been found and he was in jail."
Kennedy was not called as a direct or rebuttal witness by the state on the motion to suppress. Moreover, the record on the motion makes no explanation as to his absence, leaving Abston's testimony uncontradicted that he was offered hope of leniency if he would disclose the whereabouts of his ex-wife's body. After the motion to suppress was overruled, the cause was continued for ten days for trial.
The paramount issues raised by the assignments of error are whether the first statement and directions to the body were admissible into evidence and whether Abston was deprived of counsel in derogation of his Sixth Amendment right so that the first statement and his confession the day following the location of the body were inadmissible.
In our opinion, the court erred in overruling the motion to suppress because the testimony of the state's witnesses, as well as Abston's, placed the appellant and Assistant Sheriff Kennedy in isolation at the time the uncontradicted suggestion of leniency was made to Abston and the only witness who could rebut such testimony was Kennedy and he was not offered by the state as a witness on the motion.[1]
*1388 In Agee v. State, 185 So.2d 671 (Miss. 1966), we stated:
The State has the burden of proving the voluntariness of a confession. This burden is met by the testimony of an officer, or other person having knowledge of the facts, that the confession was voluntarily made without any threats, coercion, or offer of reward. This makes out a prima facie case for the State on the question of voluntariness. Lee v. State, 236 Miss. 716, 112 So.2d 254 (1959). When objection is made to the introduction of the confession, the accused is entitled to a preliminary hearing on the question of the admissibility of the confession. This hearing is conducted in the absence of the jury. Lee v. State, supra, is also authority for the proposition that when, after the State has made out a prima facie case as to the voluntariness of the confession, the accused offers testimony that violence, threats of violence, or offers of reward induced the confession, then the State must offer all the officers who were present when the accused was questioned and when the confession was signed, or give an adequate reason for the absence of any such witness. See also Holmes v. State, 211 Miss. 436, 51 So.2d 755 (1951).
(185 So.2d at 673)
See also Hicks v. State, 355 So.2d 679 (Miss. 1978); Curry v. State, 328 So.2d 328 (Miss. 1976); Booker v. State, 326 So.2d 791 (Miss. 1976); White v. State, 306 So.2d 299 (Miss. 1975); Younger v. State, 301 So.2d 300 (Miss. 1974); Rowell v. State, 239 So.2d 917 (Miss. 1970); Stevens v. State, 228 So.2d 888 (Miss. 1969); and Williams v. State, 220 So.2d 325 (Miss. 1969).
Although we are of the opinion the trial court erred in overruling the motion to suppress the first statements leading to the body, this does not dispose of the case. It does bring into focus the issue of whether a necessary witness, under the Agee rule, may be called during the trial in chief to rebut testimony previously offered on a suppression hearing that has been concluded by the court in overruling the motion. We think this procedure would thwart the very purpose of a pretrial suppression hearing, which is to evaluate the evidence so that the parties may determine before the trial the evidence available to them and prepare for trial accordingly. Such piecemeal procedure would leave both the prosecution and the defense in a quandary as to trial preparation and greatly affect the conduct of the trial itself. For example, we can only surmise as to the course this trial would have taken had the motion to suppress been properly sustained. In direct violation of Agee, supra, Kennedy was not called as a witness at the suppression hearing nor was reason given for his absence. Because of this, in our opinion he was incompetent to testify during the trial in chief to facts concerning the voluntariness of the first statement.
The dispositive issue is whether the statement and confession which were obtained from the appellant after he had requested an attorney were admissible. To review, Detective Cox testified while they, including Detective Walker, were at the Abston home, the appellant requested an attorney and the questioning ceased. Detective Walker corroborates this request for an attorney and the cessation of the interrogation. Additionally, just prior to the questioning by Assistant Sheriff Kennedy, Abston talked with his attorney over the phone and was advised by Cumbest he would be over within the hour.
Kennedy testified[2] he advised Abston of his rights and apparently unaware that Abston had asked the other officers for a lawyer, began questioning him at approximately 5:00 p.m. when Abston asked him for a lawyer. He thereupon stopped the interrogation and attempted to reach Attorney Cumbest several times by phone. However, before the attorney arrived, Abston voluntarily agreed to and did show him the location of the body.
Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), designated the *1389 procedure to be followed once warnings have been given an individual:
... If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent. (384 U.S. at 474, 86 S.Ct. at 1627-1628, 16 L.Ed.2d at 723)
* * * * * *
If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. Escobedo v. Illinois, 378 U.S. 478, 490, note 14, 84 S.Ct. 1758, 1764, 12 L.Ed.2d 977, 986. (384 U.S. at 475, 86 S.Ct. at 1628, 16 L.Ed.2d at 724)
In support of his argument appellant cites U.S. v. Priest, 409 F.2d 491 (5th Cir.1969), in which a nineteen-year-old suspect with an eighth-grade education made incriminating statements to a Federal Bureau of Investigation agent during custodial interrogation. Although the youth had received the Miranda warnings and advised the agent he did not desire to sign the warning form until he had consulted with an attorney, the interrogation proceeded and a confession was obtained. It was held the statement was the product of compulsion.
The question is whether Abston effectively waived his right to counsel once his request had been made known to the officials so their interrogation should have ceased.
In Brewer v. Williams, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), the accused after consulting with attorneys was transported by law enforcement officers to another city and repeatedly stated while in transit that he would tell the whole story after seeing his attorney in the second city. During the journey the officers elicited information concerning the whereabouts of the victim's body. The Court stated:
Despite Williams' express and implicit assertions of his right to counsel, Detective Leaming proceeded to elicit incriminating statements from Williams. Leaming did not preface this effort by telling Williams that he had a right to the presence of a lawyer, and made no effort at all to ascertain whether Williams wished to relinquish that right. The circumstances of record in this case thus provide no reasonable basis for finding that Williams waived his right to the assistance of counsel.
The Court of Appeals did not hold, nor do we, that under the circumstances of this case Williams could not, without notice to counsel have waived his rights under the Sixth and Fourteenth Amendments. It only held, as do we, that he did not. (430 U.S. at 405-406, 97 S.Ct. at 1243, 51 L.Ed.2d at 440-441)
This language leads to the belief that a waiver is possible after a request for counsel, but that Williams did not under those particular facts waive such rights.
The state argues that appellant waived his rights after his request for counsel citing as authority in support of its argument Nash v. Estelle, 560 F.2d 652 (5th Cir.1977), and other cases. In Nash the defendant made an indecisive request for an attorney, wanting an attorney but also desiring to talk about the crime without waiting for an *1390 attorney to be appointed. The opinion discusses two lines of cases, one prescribing a strict interpretation of right to counsel and the other following a more lenient approach. The first line includes Priest, supra, and U.S. v. Blair, 470 F.2d 331 (5th Cir.1972), cert. den. 411 U.S. 908, 93 S.Ct. 1536, 36 L.Ed.2d 197, which holds that when a suspect makes an unequivocal request to have counsel present during questioning which police ignore and the interrogation continues, a finding of a knowing and intelligent waiver of right to counsel is impossible. The case of U.S. v. Massey, 550 F.2d 300 (5th Cir.1977), cites Priest with approval but then goes on to say:
However, a valid waiver will not be presumed simply from the fact that a confession was in fact eventually obtained, Miranda, 384 U.S. at 475, 86 S.Ct. 1602, or that a waiver was eventually signed. The record must show that "an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not a waiver." .. .
(550 F.2d at 307-308)
Although approving the strictness of the Priest decision, the language of Massey indicates that a waiver is possible under certain circumstances.
A much more lenient attitude toward admissibility of confessions once an attorney has been requested is expressed in some cases. These include U.S. v. Cavallino, 498 F.2d 1200 (5th Cir.1974), U.S. v. Hodge, 487 F.2d 945 (5th Cir.1973), and U.S. v. Anthony, 474 F.2d 770 (5th Cir.1973). In Cavallino, supra, the in-custody defendant received the Miranda warnings and understood them. Questioning began, but ceased as soon as Cavallino indicated he wanted to talk to an attorney. Later the defendant requested to speak with a police sergeant to see if they could make a "deal." The officer made no "deal" and the defendant made no incriminating statement; whereupon the conversation terminated. Again defendant sought out the officer, was administered the warnings and with full understanding of them confessed. That Court stated the waiver by a defendant of his constitutional right to consult with or have an attorney present did not require an express disavowal. The court found that defendant in the interim between requesting an attorney and waiving his rights engaged in a course of conduct calculated to ascertain how much the police knew and whether there was any prospect for a deal, thereby waiving the right.
In Hodge, supra, the military police arrested a soldier who was informed of his rights upon arrest and prior to questioning at which time he requested an attorney. The interview terminated and the defendant was explained the military procedure to obtain counsel and was further advised of the charges and evidence against him. Defendant changed his mind and volunteered to make a statement which was not accepted until he waived his right to counsel. The Court upheld the confession, stating that an arrestee can change his mind after requesting an attorney. And, in Anthony, supra, although the defendant had requested an attorney but later volunteered statements which were not the product of interrogation, the Court held the facts established a waiver of the constitutional privilege.
These cases reflect the difficulty in determining waiver through continued conversation after a suspect has requested counsel. More directly put, the question is whether continued conversation is just that, or is conversation, subtle or otherwise, maneuvered toward an incriminating statement, or is continued interrogation despite the request, or is conversation incriminating in substance knowingly and willfully given by a suspect implicit in which is the waiver of a previously expressed constitutional right.
The more recent case of Brewer v. Williams, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), expresses the rule for this Court to follow in deciding such issue. It reiterated the words of Mr. Justice Frankfurter that questions of waiver require "`application of constitutional principles to the facts as found... .'" and went on to hold the standard to be applied in determining waiver as a matter of constitutional *1391 law  that it was incumbent upon the state to prove "`an intentional relinquishment or abandonment of a known right or privilege'" and "courts indulge in every reasonable presumption against waiver," citing cases. In McDougle v. State, 355 So.2d 1386 (Miss. 1978), we held the Miranda opinion does not proscribe further interrogation once a desire to remain silent has been expressed, but that it does require cessation of interrogation when requested, but if there is a reasonable basis subsequently for inferring that a suspect has voluntarily changed his mind, new and adequate warnings must be given. Compare Holifield v. State, 275 So.2d 851 (Miss. 1973).
Finally, in giving application to the Brewer standard we conclude the state did not meet the heavy burden of establishing a knowing and intentional waiver by Abston of his constitutional right and that the statements and direction to Assistant Sheriff Kennedy and the confession to Detectives Walker and Cox were inadmissible in evidence. In reaching this conclusion we have considered Abston's illiteracy, his repeated requests for an attorney, his first talk with his attorney, the assurance the attorney would be there within the hour, the cessation of interrogation and shunting to another officer, unaware of the request, for further interrogation. These circumstances do not meet the requirement of a knowing and intelligent waiver. Indeed, by indulging "every reasonable presumption against waiver" commanded by Brewer, supra, a contrary result must be reached.
REVERSED AND REMANDED.
SMITH and ROBERTSON, P. JJ., and SUGG, WALKER, BROOM, LEE, BOWLING and COFER, JJ., concur.
NOTES
[1] He was a state witness in the trial in chief over the defendant's objection.
[2] In chief.