365 So.2d 1198 (1978)
Richard Gerald JORDAN
v.
STATE of Mississippi.
No. 50551.
Supreme Court of Mississippi.
November 22, 1978.
Rehearing Denied January 24, 1979.
*1199 Levi, Denham & Russell, Rhett R. Russell, Ocean Springs, for appellant.
A.F. Summer, Atty. Gen., by Karen A. Gilfoy, Asst. Atty. Gen., Jackson, for appellee.
En Banc.
BROOM, Justice, for the Court:
Capital punishment was ordered at Richard Gerald Jordan's trial upon an indictment charging him with murder while engaged in the commission of the crime of kidnapping. The Circuit Court of Jackson County, Mississippi, tried the case, venue having been changed from Harrison County. Mrs. Edwina Marter was the victim of Jordan's offenses committed on January 13, 1976, and his appeal asserts a number of grounds for reversal. We affirm.
Originally Jordan, a twenty-nine year-old white man, was prosecuted, convicted, and sentenced to death at a trial which ended July 21, 1976. He filed a motion for a new trial which was continued for a time and then sustained on October 27, 1976, for retrial under the Jackson v. State, 337 So.2d 1242 (Miss. 1976) guidelines. At retrial Jordan was again sentenced to death. Jordan now prosecutes this appeal, represented by court appointed counsel who vigorously and astutely defended him below.
On or about January 10, 1976, in Baton Rouge, Louisiana, Jordan traded a shotgun for a 38-calibre revolver. Then he came to Gulfport, Mississippi, and obtained lodging at Twin Star Motel where he registered as "Jack Wilson." His signature "Jack Wilson" was shown by an expert to have been made by the same person who wrote a sample of writing known to be Jordan's. With kidnapping in his mind, and using the fictitious name of "Jack Wilson," Jordan called Gulf National Bank and expressed a desire to speak to the commercial loan officer. He was referred to Mr. Marter, whose wife was soon to be Jordan's victim. Perusal of the telephone directory revealed to Jordan only one Gulfport listing of the name "Marter" (the family Jordan made part of his plot). Having obtained the Marter address from the directory, Jordan drove by the Marter residence where several cars were parked, including a Mercedes and a sports car. After all but one of the cars was driven away, Jordan dialed the *1200 Marter residence telephone number and heard a female's (Mrs. Marter's) voice answer. Then he decided to make his move.
Dressed in a sport coat, tie and knit pants, and carrying a manilla folder, Jordan went to the Marter residence. He rang the doorbell and was greeted by Mrs. Marter whom he told that his electrical company had received information of defective circuit breakers in the area which he was investigating. Mrs. Marter admitted him inside, whereupon he kidnapped Mrs. Marter at gunpoint and took her away, leaving her three-year-old son asleep in the house. At his command, she drove him out into the sparsely settled DeSoto National Park wooded area. They traveled down a logging road to where he ordered her out of the car, telling her that she would stay there with his partner until he obtained money from her husband, after which he would release her. She became extremely fearful when she discovered there was no partner there, and as she ran for her life Jordan (a self-described marksman) shot her dead by firing a bullet from the revolver into the back of her head. He then went to a telephone and called Mr. Marter at the bank. Demanding $25,000, Jordan stated: "We have your wife ..." and gave Marter directions how to deliver the money up on Highway 49. Marter quickly obtained the money, but his efforts to drop it where directed failed because he did not find the coat (beside the highway) upon which he was supposed to drop the money. Being fearful on account of two vehicles following Marter, Jordan had decided against putting out the coat.
Jordan then took the revolver (murder weapon) and threw it into the Big Biloxi River, from which it was later recovered after he revealed its location. Before Mr. Marter again attempted to deliver the money as directed by a second telephone call from Jordan, the money was serialized and microfilmed with FBI officers then actively investigating the matter. During this second telephone conversation (about 9:00 a.m., January 13) between Jordan and Mr. Marter, Jordan assured Marter that his wife was all right, and demanded that Marter drop the money on Interstate U.S. Highway 10. Marter proceeded as Jordan directed; this time he found the coat and dropped the money on it. Two officers, Deputy Sheriff Larkin Smith and FBI Agent Shepherd, having been made aware of what was going on, were positioned near the scene of the drop and saw Jordan place a coat there. Soon they saw him pick up the money, after which they gave chase at high speed. During the chase, Jordan rammed his car into the vehicle of the officers, running them off the road. They shot at his receding car, but Jordan continued his flight although his car was rendered partially disabled when, in the ramming episode, a bent fender came in contact with a tire. Farther on, Jordan abandoned his vehicle at a shopping center, hid the money in the woods, went to another shopping center, and, at a T.G. & Y. store, purchased a red jump-suit which he donned before he left the store. He got a taxi at the shopping center and told the driver to take him to Twin Star Motel. Not knowing that Jordan was the man for whom a large search was under way, the taxi driver told Jordan that roadblocks were up and that the officers were looking for someone. En route to the motel, the taxi was stopped and an officer identified Jordan from a picture already obtained by the FBI. The officer arrested Jordan and turned him over to the FBI. That afternoon (January 13, 1976) Mrs. Marter's body was found. On the next day a diver from the Gulfport Fire Department retrieved the murder weapon from the river.
A significant portion of the evidence upon which Jordan was convicted were statements which he made against his interest, which the state placed into evidence over his objection. Jordan did not testify except as to matters taken up outside the jury's presence. He was arrested January 13, 1976, and charged with Mrs. Marter's murder, after which he confessed to FBI Agent Watts and, later the same day, to Harrison County law officer Allbritton. Jordan argues that his confession to Allbritton was obtained and used against him in *1201 violation of his constitutional right to counsel and privilege against self-incrimination. By motion to suppress, he unsuccessfully sought to have excluded his confession made to Allbritton.
Facts pertinent to the suppression motion show that Jordan was arrested at the road-block in the early afternoon of January 13, 1976, and taken to the FBI offices. En route, Agent Tollison advised Jordan of his rights and stated that as he read the rights to Jordan, Jordan recited them "along with me." At approximately two o'clock that afternoon, another FBI agent (Frank Watts) again advised Jordan of his rights, which Jordan stated he understood and then executed a written waiver. Up to that time Jordan made no request for counsel.
After first denying having anything to do with the kidnapping or murder, Jordan confessed (to Watts) most of his actions connected with the kidnapping and murder. He admitted that he made ransom demands by telephone, and he also furnished a map, which he made in his own handwriting, of the area where he left Mrs. Marter's corpse. His oral confession described in considerable detail his actions of January 12 and 13. Other inculpatory information which he gave at that time included his accompanying the law officers as he retraced his actions. He showed them the location of the following items: the clothing he had hidden after wearing it the day before, the weapon, the ransom money, and the automobile which he used and abandoned in the shopping center. Afterward, he was put into the custody of Harrison County Sheriff Hobbs.
Then at about 4:45 p.m. of that day, Jordan was carried before the county judge who advised Jordan that he was charged with a capital offense. Jordan expressed a desire to delay any proceedings until counsel was appointed for him, whereupon Honorable Rhett Russell (not present at these proceedings) was appointed as his counsel. Prior to the appointment of counsel, at about 2:30 p.m., one Allbritton (an investigator of the Harrison County Sheriff's Department) was given charge of the case. At about 5:30 p.m., Officer Allbritton visited Jordan at the county jail, fingerprinted and photographed him, and began to interview him, not knowing that Jordan had requested counsel or that one had been appointed. At about 6:00 p.m., Jordan was advised of his rights by Officer Sullivan, who meanwhile had arrived and who taperecorded Jordan's statement (a typewritten transcript appears in the record), which amounted to a confession, the content of which was substantially the same as the one given FBI Agent Watts. Throughout all of the interview, according to Allbritton's unequivocal testimony, Jordan made no indication that an attorney had been appointed for him and made no request for counsel during the interview. After a transcript of the interview was made, Jordan refused to sign it. It is uncontradicted that Jordan had been advised of his rights at least five times prior to his interview with Officer Allbritton, and understood his rights. At the hearing of his motion to suppress, Jordan testified: "I feel sure that I did tell him (Allbritton) that I had an attorney appointed for me." Nevertheless, his statement, recorded with his knowledge, contains no indication that Jordan ever mentioned any attorney on the tape, and Jordan admits that Allbritton made no inducements to him such as promises, threats, or intimidations in exchange for any statement. The critical issue is: WHEN AN ACCUSED PERSON, WHO HAS REQUESTED COUNSEL AND FOR WHOM COUNSEL HAS BEEN APPOINTED, IS INTERVIEWED BY A LAW OFFICER WHO HAS NO KNOWLEDGE OF SUCH REQUEST FOR OR THE APPOINTMENT OF COUNSEL, AND IN SUCH A SITUATION THE ACCUSED, AFTER BEING PROPERLY ADVISED OF HIS RIGHTS, VOLUNTARILY MAKES INCRIMINATING STATEMENTS, MAY SUCH STATEMENTS BE ADMITTED INTO EVIDENCE?
A facet of the case not raised by Jordan as error is noted by the state concerning a threat allegedly made by FBI Agent Watts that he would throw Jordan out the window of a building. The state's brief has the *1202 chronology and context of the record out of order in this respect, but correctly asserts that there is no reversible error in this regard. On direct examination Watts generally denied the threat, after which Jordan gave specific details of the alleged threat which he said was in the presence of Watts, Hargrove, Payne and another. Then, contrary to the state's brief, Watts was recalled as a witness and categorically denied the threat in specific detail as did the other witnesses present on the occasion in question, in accord with Agee v. State, 185 So.2d 671 (Miss. 1966).
The essence of Jordan's argument here is his contention that: "Evidence obtained by interrogation, after a request for counsel, could not be used" against him. Jordan's argument is based in the main on Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966). Jordan cites Holifield v. State, 275 So.2d 851 (Miss. 1973), which held that where a suspect requests counsel, his request must be complied with prior to interrogation. However, the facts of both Holifield and Miranda are different from the unique facts of the present case, and no case has been cited precisely on point with facts just like the facts of this case. In deciding here as to admissibility, we must look to the totality of the evidence. Indeed the evidence does establish that Jordan was of considerable intelligence, able to recite his rights when read to him by one of the officers, and twenty-nine years of age, and no suggestion was made that he was illiterate or not able to read, write, and comprehend his rights. The vocabulary and sentence structure used by Jordan in the record establishes that he was mentally alert and quite articulate. The overriding fact here is that Jordan was advised of his rights at least four times before he voluntarily made his inculpatory statements to Allbritton. By his own testimony he said that Allbritton asked him if he understood his rights and that he responded, "Yes."
Under Miranda, supra, the law is that where the accused has requested an attorney, the results of any subsequent interview or interrogation may be admitted into evidence only after the prosecution has met its heavy burden to establish that the accused "knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel" (384 U.S. at 474-75, 86 S.Ct. at 1628, 16 L.Ed.2d at 723-24). Although in a concurring opinion in Michigan v. Mosley, 423 U.S. 96, 109, 96 S.Ct. 321, 329, 46 L.Ed.2d 313 (1975), Justice White seemed to indicate that Miranda created "a per se rule against further interrogation after assertion" of the right of an accused to counsel, two years later Nash v. Estelle, 560 F.2d 652 (5th Cir.1977), held that an accused suspect may, after requesting counsel, "knowingly and intelligently" waive his right thereto. Subsequently, in Brewer v. Williams, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), the United States Supreme Court made it clear that an accused can voluntarily, knowingly and intelligently waive his right to counsel at an interrogation which occurs after counsel has been appointed, provided the prosecution has adequately carried its heavy burden to show that the waiver was knowingly and intelligently made.
Abston v. State, 361 So.2d 1384 (Miss. 1978), dealt with a similar legal question, but the instant case is distinguishable on the facts. Abston, an illiterate, requested an attorney, the questioning ceased, and shortly thereafter another officer, apparently unaware that Abston had asked for an attorney, was called in. The officer advised Abston of his rights and began questioning him, when Abston again requested a lawyer. Thereupon, he ceased interrogating Abston and attempted to reach an attorney several times by phone, but before the attorney arrived Abston had revealed the location of the body of the victim of his homicide. We held this evidence to be inadmissible. Our decision in Abston, however, is not authority for us to hold on the dissimilar facts of the instant case that the lower court erroneously overruled Jordan's motion to suppress.
*1203 The opinion in Abston, by Chief Justice Patterson, states "that a waiver is possible after a request for counsel" but waiver of Abston's rights was not established by the record. Abston cites several federal cases indicating that admissibility of confessions made after an attorney has been requested depends upon the factual situation. After considering Abston's "illiteracy, his repeated requests for an attorney, his first talk with his attorney, the assurance the attorney would be there within the hour, the cessation of interrogation and shunting to another officer, unaware of the request, for further interrogation," we held that "these circumstances do not meet the requirement of a knowing and intelligent waiver."
In the present case there is no indication of illiteracy on the part of Jordan but, to the contrary, the record here shows that he was a very intelligent individual who not only understood but could recite his rights. There is no indication of any deliberate "shunting" of Jordan from one law officer to another. Equally important is the fact that the circumstances surrounding Jordan's second confession (the disputed one) are quite different from the circumstances in Abston. Prior to requesting counsel, Jordan had already admitted to FBI Agent Watts everything which he subsequently admitted to Allbritton. Before the controversial confession to Allbritton and before requesting counsel, Jordan had already voluntarily directed the officers to the place where Mrs. Marter's body was found, and pointed out other locations where critical items of physical evidence were located. By the time Jordan gave Allbritton the controversial confession attacked by the motion to suppress, he had been advised of his rights at least five times, had acknowledged that he understood them, and had even recited them as they were related to him. Moreover, both the tape recording and the transcript of the second confession show that Jordan did not mention that he had an attorney or wanted one. In this confession he acknowledged that he had neither been promised anything in exchange for his statement, nor threatened or intimidated. The facts here show that in making his statement to Allbritton, Jordan knowingly and intelligently waived both his right to counsel and his privilege against self-incrimination.
It is also clear that the disputed confession made by Jordan to Allbritton was merely cumulative of and not in any significant manner different from that to which he had already confessed to the FBI agent, Watts. By receiving the disputed confession, the jurors did not receive any evidence incriminating Jordan that was not already in evidence. Upon the record, we cannot say the trial court erred in overruling the motion to suppress the disputed confession or in admitting its contents into evidence.
Jordan's mental condition and competency to stand trial and assist in his defense is the next proposition presented. At his request Jordan was examined at Gulf Coast Health Center in Gulfport, but subsequently he moved to be examined at Mississippi State Hospital. His proof in this regard includes the testimony of Dr. Clifton Davis, a psychiatrist who diagnosed Jordan as a "sociopathic personality" but capable of understanding the charges against him and able to assist counsel. Dr. Davis stated that Jordan might give or withhold information casting himself in the best light. On cross-examination Dr. Davis stated that Jordan gave no indication that he could not distinguish right from wrong or could not assist counsel. Counsel for Jordan testified to the contrary  that Jordan was not of sound mind and uncooperative. The doctor stated that in his opinion Jordan "is capable of distinguishing right and wrong and of assisting counsel." Dr. Davis also testified that Jordan freely talked with him and boasted "about how he thought he was going to beat the rap " and claimed to have a tested I.Q. of 145. In light of the testimony of Dr. Davis, the psychiatrist called by the defense, we cannot say that the trial court erred in refusing to order further psychiatric examination of Jordan. The testimony accepted by the trial court failed to indicate a reasonable probability that Jordan was incapable of making a rational *1204 defense. Hill v. State, 339 So.2d 1382 (Miss. 1976), is not applicable because in it a psychiatrist recommended that the defendant be further examined at Mississippi State Hospital.
Thirdly, Jordan argues that the trial court erred in overruling his motion to subject himself to a polygraphic examination so as to aid in his defense. At the pre-trial hearing of the motion to suppress, Jordan testified that he was denied assistance of counsel and threatened, such denial and threats causing him to give incriminating information against himself. When the suppression hearing concluded, he reintroduced a previous motion requesting that he and the officers who were present when the statements were made be allowed to take a polygraphic examination so that the results thereof could aid the trial judge in deciding the motion to suppress. Under our case law, neither the taking of a polygraphic examination (lie detector test) nor its result is admissible in evidence. Harrison v. State, 307 So.2d 557 (Miss. 1975); United States v. Sockel, 478 F.2d 1134 (8th Cir.1973); United States v. Masri, 547 F.2d 932 (5th Cir.1977).
Next Jordan urges that the court erred in overruling defense motions and objections pertaining to the manner in which the state examined prospective jurors concerning their conscientious scruples against the infliction of the death penalty. A review of the record, however, indicates that the guidelines of Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and Stevenson v. State, 325 So.2d 113 (Miss. 1975), were adhered to in every instance, as held by the lower court. Accordingly, there is no reversible error in this aspect of the case.
Jordan asserts that the court erred in overruling motions to quash the indictment and grant a new trial on the grounds that retrospective application of the procedures pursuant to Jackson v. State, supra, would violate the constitutional prohibition of ex post facto laws. Jordan committed the murder of Mrs. Marter on January 12, 1976, and he was tried in accord with our pronouncements in Jackson v. State, 337 So.2d 1242 (Miss. 1976), which we handed down October 5, 1976. On this basis, Jordan says that application of Jackson, supra, to his trial constitutes a violation of "state and federal prohibitions against ex post facto laws." This question, however, has already been decided adversely to Jordan's position. Bell v. State, 353 So.2d 1141 (Miss. 1978); Irving v. State, 361 So.2d 1360 (Miss. 1978).
Jordan also contends that the court erred in overruling motions to quash the indictment and grant a new trial in that the rationale of Jackson v. State, 337 So.2d 1242 (Miss. 1976), constitutes radical irregularity in the lawmaking process in violation of due process. The gist of Jordan's argument here is that "the court cannot create a law. Its sole power is to enforce the statute as written by the legislature." This same argument was made in Gray v. State, 351 So.2d 1342 (Miss. 1977), but in Gray we adhered to our decision in Jackson, supra. See Hill v. State, 339 So.2d 1382, 1386 (Miss. 1976). We point out that since we decided Jackson, supra, we have reversed and remanded fourteen cases where the death penalty was ordered in cases which predated Jackson. In all of these fourteen cases we ordered retrial under the directions of Jackson. Hicks v. State, 355 So.2d 679 (Miss. 1978); Stevenson v. State, 354 So.2d 1095 (Miss. 1978); Davis v. State, 349 So.2d 509 (Miss. 1977); Spencer v. State, 348 So.2d 1030 (Miss. 1977); Culberson v. State, 348 So.2d 1025 (Miss. 1977); Caldwell v. State, 347 So.2d 1389 (Miss. 1977); Pickle v. State, 345 So.2d 623 (Miss. 1977); Moore v. State, 344 So.2d 731 (Miss. 1977); Henderson v. State, 342 So.2d 744 (Miss. 1977); Jones v. State, 342 So.2d 735 (Miss. 1977); Ivey v. State, 341 So.2d 918 (Miss. 1976); and Wansley v. State, 339 So.2d 989 (Miss. 1976). In Upshaw v. State, 350 So.2d 1358 (Miss. 1977), we reversed and remanded for a new trial under Jackson and Miss. Gen'l Laws Ch. 458 (1977). On August 2, 1978, we again followed Jackson in Irving v. State, infra.
*1205 Reversal is also urged on the basis that the court erred in refusing appellant's jury instruction D-13 at the second phase of the trial. D-13 states:
The Court instructs the jury that you do not have to find any mitigating circumstances in order to return a verdict that the accused should be sentenced to life in prison.
Here, Jordan relies on Jackson v. State, which held:
The jury shall not be required to make a special finding of any mitigating circumstances in order to return a verdict that the accused should be sentenced to life in prison. However, before the jury may return a verdict that the defendant should suffer the penalty of death, they must unanimously find in writing that after weighing the mitigating circumstances and the aggravating circumstances one against the other that the mitigating circumstances do not outweigh the aggravating circumstances and that the defendant should suffer the penalty of death. (Emphasis added).
We note the great difference in not requiring the jury to find any mitigating circumstances in order to return a verdict of life imprisonment as opposed to not requiring the jury to "make a special finding of any mitigating circumstance in order to return a verdict that the accused should be sentenced to life in prison." (337 So.2d at 1256). If there were any merit to Jordan's contention here, and if instruction D-13 be considered as correct, the jury resolved the issue by finding:
We unanimously find that after weighing the mitigating circumstances and the aggravating circumstances, one against the other, that the mitigating circumstances do not outweigh the aggravating circumstances, and that the Defendant should suffer the penalty of Death.
Upon these facts, there is no reversible error in the refusal to grant instruction D-13.
Jordan raises the argument that the court erred in granting, over his objections, three unnumbered jury instructions requested by the state at the second phase of the trial containing language that the jury should fix the penalty at death, unless the mitigating circumstances shown by the evidence outweigh the aggravating circumstances. The three instructions in dispute are as follows:
The Court instructs the Jury that before you may return the death penalty, you must unanimously find in writing that after weighing the mitigating circumstances and the aggravating circumstances one against the other that the mitigating circumstances do not outweigh the aggravating circumstances and that the Defendant should suffer the penalty of death.
The Court instructs the Jury that your verdict must be written on a separate sheet of paper and be in the following form, to-wit:
(1) "WE UNANIMOUSLY FIND THAT AFTER WEIGHING THE MITIGATING CIRCUMSTANCES AND THE AGGRAVATING CIRCUMSTANCES, ONE AGAINST THE OTHER, THAT THE MITIGATING CIRCUMSTANCES DO NOT OUTWEIGH THE AGGRAVATING CIRCUMSTANCES, AND THAT THE DEFENDANT SHOULD SUFFER THE PENALTY OF DEATH." or
(2) "WE, THE JURY, FIND THAT THE DEFENDANT SHOULD BE SENTENCED TO LIFE IMPRISONMENT."
or
(3) "THE JURY HAS BEEN UNABLE TO AGREE UNANIMOUSLY ON PUNISHMENT."
(IN WHICH CASE IT SHALL BE THE DUTY OF THE COURT TO SENTENCE THE DEFENDANT TO LIFE IMPRISONMENT.)
The Court instructs the Jury that Proof beyond a reasonable doubt of the statutory elements of the capital offense with which the accused is charged shall constitute sufficient circumstance to authorize imposition of the penalty of death unless the mitigating circumstances shown by the evidence outweigh the aggravating circumstances.
*1206 Essentially, Jordan contends that "the guidelines of Jackson appear to require the Defendant to shoulder the burden of proof on mitigating circumstances versus aggravating circumstances." Jackson simply holds, however, that one on trial for the charge involved here must be given an opportunity to present any "circumstance or combination of circumstances surrounding his life and character or the commission of the offense with which he is charged that would be reasonably relevant to the question of whether he should suffer death" or life imprisonment. (337 So.2d at 1256). Jurrek v. Texas, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), held that:
A jury must be allowed to consider on the basis of all relevant evidence not only why a death sentence should be imposed, but also why it should not be imposed. (Emphasis added). (428 U.S. at 271, 96 S.Ct. at 2956, 49 L.Ed.2d at 938).
We understand the established law to be that one on trial for capital murder must be allowed, at his option, to present mitigating circumstances. Here, Jordan exercised his option and presented evidence of his good reputation, and his good relationship with his parents. A preacher testified that Jordan had made a decision to "settle his issues as far as God is concerned."
Contention is made that the court erred, after the jury in the second phase of the trial made certain statements in open court, in overruling appellant's motion to direct a sentence of life in prison or, in the alternative, to declare a mistrial. After deliberating in the second phase (as to punishment) of the bifurcated trial, the jury came into open court and announced that no agreement had been reached as to punishment. At that point the judge ordered them to go back into the jury room and follow the instructions already given. Then Jordan's counsel moved for a mistrial or for the court to impose a life sentence, which motion was overruled, and the district attorney inquired of defense counsel if the motion was for a mistrial and confessed the motion. Then the trial judge offered defense counsel an opportunity to renew the motion for a mistrial, but counsel declined to renew the motion. Almost an hour later, the jury returned the verdict fixing the penalty at death, and all jurors, upon being polled, affirmatively indicated that they voted for the death penalty, leaving no doubt that the jury unanimously agreed on the verdict. Upon the posture of this case, the trial court's refusal to enter a mistrial when the defense counsel declined to renew its motion cannot be error. The jurors, when they first came back into open court, did not announce that they could not reach a verdict even if given additional time to deliberate. Sharplin v. State, 330 So.2d 591 (Miss. 1976), authorizes the trial judge to return the jury for further deliberations if he thinks it likely that a verdict may be reached.
There is no merit whatever to the contention that the court erred in overruling appellant's motion in opposition to the jury in the second phase of the trial being brought into open court for inquiry. Argument on behalf of Jordan is that:
It was not good practice to bring the Jury into an Open Court which contained as spectators the widower of the victim, and a majority of the State's witnesses and which did not contain as spectators any of the family of the accused or any witnesses on his behalf. Such actions prejudiced Appellant and could have been easily prevented by bringing the Jury back into Court in a closed session.
The public has a substantial interest in the public nature of a trial and the action of the trial court in allowing the jury to come into open court was not inappropriate. Rogers v. United States, 422 U.S. 35, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975); Brown v. State, 222 Miss. 863, 77 So.2d 694 (1975). We point out that the record does not indicate that Jordan was prejudiced by the action of the jury in returning into open court rather than in "closed session."
Pursuant to Jackson v. State, supra, and now as required by Miss. Code Ann. § 99-19-105 (Supp. 1977), we review every case involving the death penalty as a preference case and do so in a careful, painstaking, *1207 and discriminating manner. In doing so, we compare the record in each case with similar cases in order to insure that infliction of the death penalty is not excessive when the aggravating and mitigating circumstances are weighed against each other. By these procedures, the death penalty will not be wantonly or freakishly imposed, but imposed only in a consistent and even-handed manner. We affirmed the death penalty in Bell v. State, 360 So.2d 1206 (Miss. 1978), which involved a murder-robbery conviction where the defendant was seventeen years of age. There he took part in the service station robbery and in the slaying of the eighteen-year-old service station attendant after the robbery. Likewise, Washington v. State, 361 So.2d 61 (Miss. 1978), was a robbery-murder conviction resulting in a death sentence. There Washington, along with another, immediately after robbing a convenience store, shot one of the proprietors with a shotgun and fatally wounded him. Washington was an unmarried, twenty-three-year-old male who had a three-year-old daughter, and his past record consisted only of conviction of a marijuana crime. We affirmed the death penalty conviction in Irving v. State, 361 So.2d 1360 (Miss. 1978), in which Irving was convicted of robbery-murder. Irving shot and killed the proprietor of a country store by shooting him in the neck with a shotgun at close range while attempting the robbery. He was twenty years of age, with a previous conviction of burglary. In the case of Voyles v. State, 362 So.2d 1236 (Miss. 1978), Voyles was given the death penalty for the capital murder of his girl friend, Bernice Griggs, with whom he had been having an affair for some time. Voyles was thirty years old and apparently killed his girl friend because of his disappointment in her purchasing a car and not placing it in his name. He beat her into unconsciousness and then ran over her with her automobile which he was driving, after which he took money from her person and kept her car for his own use and subsequently tried to sell it. Voyles had a past criminal record consisting of only a conviction upon a plea of guilty to burglary.
The present case reveals that Jordan, twenty-nine years old, a former member of the armed forces, out of a desire to obtain money, abducted Mrs. Marter at gunpoint and fatally shot her out in the woods when she tried to escape. Afterward, he continued with his grotesque scheme to obtain money by demanding and receiving a ransom from his victim's husband. The record is devoid of proof of Jordan's past criminal record, if any. Our careful review of the entire record in this case, and comparing it with the other cases involving death penalties affirmed since Jackson, supra, establishes that the death penalty here is not excessive when the aggravating and mitigating circumstances are weighed against each other. Infliction of that penalty here will not in any manner be either wanton or freakish, and will be consistent and even-handed with other death penalty cases previously affirmed by this Court.
Scrutiny of the record shows that the jury which tried the case[1] was specially sworn in accordance with the pertinent statute, Miss. Code Ann. § 13-5-73 (1972). On an occasion when Jordan was out of the jury's presence with his parents, the record shows that Jordan's trial was not allowed by the court to resume until he was again properly present. According to the record, Jordan was present when prospective jurors' names were drawn from the box.
The case was well tried by both sides and the trial judge took every possible action to insure that a fair trial was afforded though the crime committed by Jordan was extremely calloused and disdainful of human life and human feelings. Jordan's guilt was established beyond any reasonable doubt by an unbroken chain of physical evidence corroborated by his confession (given to FBI Agent Watts) which was not tainted in any respect. No reversible error has been pointed out by counsel, or revealed by our painstaking scrutiny of the entire record.
Friday, the 12th day of January, 1979, is fixed as the date of execution of the death sentence.
AFFIRMED.
*1208 PATTERSON, C.J., SMITH and ROBERTSON, P. JJ., and SUGG, WALKER, LEE, BOWLING and COFER, JJ., concur.
NOTES
[1] The same jurors who tried the case as to guilt also tried the issue of punishment.