# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2002-KA-00400-SCT

*SAM IVAN MARTIN*

*v.*

*STATE OF MISSISSIPPI*


| | |
|---|---|
| DATE OF JUDGMENT: | 08/01/2001 |
| TRIAL JUDGE: | HON. JAMES W. BACKSTROM |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | ROSS PARKER SIMONS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: DEIRDRE McCRORY |
| DISTRICT ATTORNEY: | KEITH MILLER |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 04/22/2004 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.     Sam Ivan Martin was convicted in the Circuit Court of Jackson County of the murder of his wife, Crystal, and was sentenced to life imprisonment in the custody of the Mississippi Department of Corrections. Aggrieved by the judgment rendered against him, Martin appeals to this Court contending that the circuit court erred in (1) finding him competent to stand trial, (2) denying his motion to suppress two inculpatory statements he made to law enforcement, and (3) sentencing him under a statute which unconstitutionally delays his potential earned time release based upon his age. Finding no merit to Martin's contentions, we affirm his conviction and sentence.

**FACTS AND THE PROCEEDINGS IN THE TRIAL COURT**

¶2.    On August 8, 1998, Deputy Sheriff Robert Zwick of the Jackson County Sheriff's Department responded to a 911 call at the residence of Sam Ivan Martin and Crystal Martin. While at the residence, Deputy Zwick discovered that Crystal was not at home and there appeared to be signs of a disturbance. Deputy Sheriff Mike Sears discovered casings from a 12-gauge shotgun. Fearing foul play, Detective Sergeant James O'Bryant of the Jackson County Sheriff's Department (Criminal Investigation Division) arranged for Martin to come in for questioning on August 9, 1998. After being interrogated by Investigator O'Bryant, Martin confessed that he had shot Crystal after she had attempted to shoot herself. Martin then buried Crystal's body in the septic tank behind the couple's home. Crystal's body was removed from the septic tank, and it was determined that she had suffered from two shotgun blasts, one to her face and one to her chest. Martin was arrested on August 9, 1998.

¶3.    Martin was indicted, tried, found guilty of murder and sentenced to serve a term of life imprisonment in the custody of the Mississippi Department of Corrections. The trial court denied Martin's motion for a new trial or, in the alternative, a JNOV.

**DISCUSSION**

**I. Competency Hearing**

¶4.    On July 31, 2001, a hearing was conducted to determine whether Martin was competent to stand trial. Dr. J. Donald Matherne, a board-certified clinical psychologist, testified for the defense. Dr. Matherne was substituted for Dr. L. Mulry Tetlow, a licensed

2

psychologist, in June 2001 to serve as the court-appointed expert for Martin. Dr. Matherne interviewed Martin on July 14, 2001, spending approximately three hours with Martin. Over the next week, he reviewed approximately 255 pages of background information. After reviewing this information, Dr. Matherne was made aware of the fact that he had had prior contact with Martin when Martin was under the custody of the Department of Human Services due to parental neglect in approximately 1986. At the time Dr. Matherne had suggested Martin remain in the residential placement of Mill Creek. DHS concurred with his findings, and Martin remained there for several months. On July 26, 2001, Dr. Matherne dictated his report which was immediately hand-delivered to the Jackson County Public Defender's Office. Upon receiving Dr. Matherne's report, the Public Defender's Office immediately provided a copy to the District Attorney's Office.

¶5.     Dr. Matherne testified that during his evaluation he performed intellectual, educational and personality testing. Dr. Matherne stated that he also performed competency testing and evaluated Martin's capabilities in dealing with his *Miranda* warnings. Dr. Matherne noted that, in addition to his evaluation, Martin was also evaluated in 1981, 1984, 1986, 1987, 1990 and 1992. Dr. Matherne incorporated these six prior intellectual evaluations into his own report. Using (1) Martin's prior special education records from school; (2) prior psychometric testing; (3) the evaluations from Mill Creek; (4) the disability evaluation by the Social Security Administration in 1992; (5) his own evaluations; and (6) an instrument called the MacArthur Competence Assessment Tool-Criminal Adjudication,

3

developed by the National Institute of Mental Health to determine competency specifically related to the ability of the defendant to proceed with adjudication, Dr. Matherne determined that Martin was "incompetent to fully understand the proceedings necessary for his defense." Dr. Matherne further determined that due to his lack of understanding of the court process, Martin would have "difficulty working together in a meaningful manner in his representation in the court process."

¶6.     Dr. Matherne determined that Martin was "significantly compromised, primarily because of his intellectual incompetency and not because of any mental incompetency." Dr. Matherne's testified that during his intellectual testing of Martin, he discovered that Martin's reading and writing skills were on a first grade level and his ability to comprehend math problems was on a third grade level.

¶7.     Dr. Matherne also testified that he utilized a test developed by Dr. Thomas Grisso to assess Martin's understanding and appreciation of *Miranda* rights. Dr. Matherne determined that Martin showed "evidence of a degree of impairment in his ability to understand his rights during interrogation, particularly concerning his right to remain silent." Therefore, Dr. Matherne concluded that Martin's "ability to understand *Miranda* was significantly compromised, and [] his ability to understand the proceedings was compromised, primarily because of his intellectual deficiencies."

¶8.     According to Dr. Matherne, he did not talk to any of Martin's family members before or after his evaluation. The history he relied on was provided in the 255 pages of background

information submitted by schools, psychologists and the Social Security Administration which spanned the last twenty years. The latest history of Martin included in the background information utilized by Dr. Matherne was a record from William Bridges, M.D., a psychiatrist, dated April 29, 1998. That record stated that Martin was "mildly mentally retarded and unable to read or write." The records indicated that Martin finished school at East Central High School in Hurley where he was in special education classes. Dr. Bridges also acknowledged that Martin had been attending Singing River Services twice a week.

¶9. Dr. Matherne chose not to interview any of Martin's family members, and he stated that he based the competency examination on Martin as he saw him on July 14, 2001. Also, Dr. Matherne testified that he did not rely solely on the information from twenty years ago inasmuch as competency is a present factor to determine. He stated that his findings were only validated by the supplemented background information; therefore, there was no need to interview family members, police, co-workers or neighbors. He also did not listen to the audio tape of the statement made to the police by Martin. Dr. Matherne was informed by Martin's counsel, Brenda Cook, that she was having difficulties communicating with Martin. Although Dr. Matherne met Katy Jones, Martin's fianceé and the mother of his child, Dr. Matherne did not question her as to the history of their relationship.

¶10. When asked if Martin was able to communicate the general facts surrounding the crime such as date, time, victim and place, Dr. Matherne responded that Martin was able to do so. However, Dr. Matherne stated that when asked hypothetical questions concerning

5

legal situations, Martin was unable to understand the role of the defendant in relation to his counsel. Dr. Matherne also stated that Martin knew the difference between the truth and a lie.

¶11.   Martin's employer, William Toulme, testified that he employed Martin at Toulme Tire, Inc. approximately a year before the hearing. Toulme stated that Martin's duties consisted of sweeping, cleaning, and sometimes changing tires. Although he stated Martin never caused any problems, Toulme testified that Martin had a difficult time following directions and his communication skills were extremely poor.

¶12.   The State's expert psychiatrist, Dr. James Rusch, testified that on the morning of the hearing he was given a packet of materials by the State for review. He was also given a synopsis of the police report and had been allowed to listen to the previous testimony of Dr. Matherne and the other defense witnesses. From the reports and testimony, Dr. Rusch testified that he did not agree with Dr. Matherne's opinion that Martin was not competent to stand trial. Dr. Rusch did agree that Martin suffered from mild or moderate mental retardation. However, Dr. Rusch testified that it was his opinion that Martin had both the capacity to communicate his needs and communicate with his counsel. He agreed that Martin may have trouble understanding the proceedings, but he did not see this as an absolute limitation. Dr. Rusch opined that once the proceedings were explained in simple concepts, Martin would be reasonably able to assist his counsel and the trial could proceed. Dr. Rusch was not able to determine if Martin understood his current legal situation because

6

he did not individually interview Martin. Also the questions and answers regarding this subject matter were not covered in the material he was given to review; therefore, he was not able to form an opinion within a reasonable degree of medical certainty.

¶13.    On cross-examination, Dr. Rusch admitted that he could not state with reasonable medical certainty that Martin was not competent to stand trial because he had not individually interviewed Martin. However, he did testify that given the same information used by Dr. Matherne, he would not have reached the same conclusion reached by Dr. Matherne that Martin was not competent to stand trial.

¶14.    At the end of Dr. Rusch's testimony, the State requested that Martin be immediately examined by Dr. Rusch. Finding that sufficient evidence had not been presented to the court so that the court could affirmatively state that Martin was competent to stand trial, the court granted the State's request. Immediately following the competency hearing, Dr. Rusch examined Martin for approximately twenty minutes. Following the interview, Dr. Rusch was reexamined by the State. Dr. Rusch stated that he had sufficient time to conduct the interview and that Martin was very cooperative during the interview. Dr. Rusch stated that it was his opinion that Martin was able to stand trial and that he "has a rational, as well as factual, understanding of the proceedings against him."

¶15.    On cross-examination, Dr. Rusch agreed that the answers Martin gave to the thirteen question McGarry test were childlike responses. Dr. Rusch also agreed that Martin had difficulty understanding areas of complex abstraction which are commonly found in a case

7

such as his. However, Dr. Rusch further stated it would be the duty of the attorney to deal with the complex roles and further explain all potential options to their clients.

¶16.    Although he noted that there was conflicting testimony, the trial court, basing its finding upon the questions that were asked by Dr. Rusch and the responses which were given by Martin, determined that Martin was competent to stand trial and was capable of assisting his attorneys.

¶17.    This Court has held that the test for competency to stand trial mandates that a defendant is one:

> (1) who is able to perceive and understand the nature of the proceedings; (2) who is able to rationally communicate with his attorney about the case; (3) who is able to recall relevant facts; (4) who is able to testify in his own defense if appropriate; and (5) whose ability to satisfy the foregoing criteria is commensurate with the severity of the case.

*Howard v. State*, 701 So.2d 274, 280 (Miss. 1997) (citations omitted). The standard for competence to stand trial is whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). The procedures which govern a competency determination were set forth in *Emanuel v. State*, 412 So.2d 1187, 1188-89 (Miss.1982). *See also* Uniform Rules of Circuit and County Court Practice 9.06. In *Emanuel*, this Court held:

> When the trial court has made a finding that the evidence does not show a probability that the defendant is incapable of making a rational defense, we

will not overturn that finding unless we can say, from the evidence, that the finding was manifestly against the overwhelming weight of the evidence. The evidence must show more than a possibility that defendant is incompetent to stand trial-the evidence must go further until it appears to the trial court that there is a probability that defendant is incapable of making a rational defense. In this initial inquiry, the trial judge must weigh the evidence and be the trier of the facts.

*Emanuel*, 412 So.2d at 1189.

¶18.   We find no evidence in the record to indicate that the trial court abused its discretion or that the determination of competency was against the overwhelming weight of the evidence. *See Snow v. State*, 800 So.2d 472, 489-90 (Miss. 2001); *Dunn v. State*, 693 So.2d 1333, 1341 (Miss. 1997). The conflict in the evidence presented is properly resolved by the trier of fact. *See Snow*, 800 So.2d at 490; *Evans v. State*, 725 So.2d 613, 663 (Miss. 1997). Therefore, this issue is without merit.

### II. Suppression Hearing

¶19.   On July 31, 2001, following the morning competency hearing, the circuit court held a hearing on the defense's motion to suppress the statements made by Martin to the Jackson County Sheriff's Department. On at least two separate occasions, Martin made statements to the Sheriff's Department. However, Martin argued that he never knowingly, voluntarily or intelligently waived his rights to an attorney. Martin also argued that the statements were elicited by undue coercion.

¶20.   The State first called Robert Zwick, a patrol deputy with the Jackson County Sheriff's Department. Deputy Zwick testified that he was dispatched to the Martin residence on Little

Bluff Road on August 8, 1998. When he first arrived at the scene, no one was at the residence. Martin arrived as Deputy Zwick was walking back to his car. Zwick testified that Martin seemed surprised when he was informed that Crystal was not at home. Martin and Zwick then entered the residence to determine if Crystal was in fact at home. Zwick testified at that point Martin was not a suspect for any crime. Although they did not find Crystal in the trailer, Deputy Zwick did discover that the couch had been moved. Zwick testified that he was familiar with the Martins' home because he had been previously called out to their residence. Zwick testified that when Martin moved the couch back to its normal position, Martin found blood. Zwick also determined that another spot, which he first thought to be a ketchup stain, was also blood. After discovering blood at the Martins' residence, Zwick then called his supervisor, Captain Bud Polifrone.

¶21. Zwick testified that while he and Martin were at the trailer, Martin told him that he and Crystal were inside eating with their four children when they heard a "bang" at the back door. Crystal went to the back door with a shotgun and informed Martin that it was his father, Chester. She also told Martin to "get the kids safe." At that time, Crystal had charges against Chester for simple assault and stalking. Zwick testified that Martin told him he then loaded all of the children inside their vehicle and left the trailer. Martin told Zwick that this was the last time he saw Crystal. Zwick testified that this was the only conversation he had with Martin. Zwick also stated that nothing was done in his presence to induce Martin to give this version of his story.

¶22.    The State next called James Robert O'Bryant, formerly a detective sergeant with the Criminal Investigation Division (CID) of the Jackson County Sheriff's Department. At the time of the hearing, O'Bryant was employed by Ingalls Shipbuilding. O'Bryant testified that he was called to the Martins' residence on August 8, 1998. O'Bryant stated that he did have an opportunity to speak with Martin once he got to the scene. Martin informed O'Bryant that Crystal was gone; however, Martin did not elaborate except to say that he and Crystal were having problems and were separated at the time. O'Bryant made arrangements for Martin to come to the CID office the next day. At this point in the investigation, O'Bryant testified that Martin was now a suspect in Crystal's disappearance. Before questioning Martin, O'Bryant stated that he read Martin his *Miranda* rights using the Department's standard form. After being read his *Miranda* rights, Martin signed the form. O'Bryant stated that Martin appeared to understand the form and he agreed to talk to O'Bryant. O'Bryant testified that no one threatened or coerced Martin in his presence. O'Bryant stated that he made an audio tape of the interview. After this initial interview, O'Bryant stated that he left the room to attend to Department business. Martin was left in the interview room alone with Captain Carew. When O'Bryant returned to the room and after Captain Carew had left the room, Martin made another statement which was not recorded. O'Bryant testified that Martin broke down and told him that "the shotgun went off, hit her in the side of the head and her eyeball was hanging out and he didn't want her to suffer, and so, he shot her in the chest." O'Bryant testified that Martin stated he then placed Crystal's body in the septic tank outside the

11

trailer. O'Bryant testified that he did not coerce Martin to make this statement. This conversation which occurred approximately fifteen minutes after the taped conversation was the last conversation O'Bryant had with Martin.

¶23. On cross-examination, O'Bryant stated that Martin was read his rights at approximately 3:00 p.m. on August 9, 1998. However, the statement given by Martin was not recorded until 5:12 p.m. and lasted approximately five minutes. O'Bryant testified that several officers talked with Martin on the afternoon of August 9. O'Bryant also testified that Martin had indicated to him that he had been beaten while he was alone in the interrogation room with Captain Carew. However, O'Bryant testified that he did not condone offensive procedures, and if those types of procedures had occurred in his presence, he would have cleared the interrogation room and privately conducted the interview. O'Bryant stated that after he had conducted the initial taped interview, he was instructed by Captain Carew to leave the interview room. When he reentered the interview room, Martin was very upset. Martin then told O'Bryant that Captain Carew hit him. O'Bryant testified that based on Martin's emotional state, he believed Martin was telling the truth about the beating.

¶24. The State then withdrew the introduction of the third statement made by Martin after the incident occurred between Martin and Captain Carew. The State proposed to introduce the first statement made to Officer Zwick and the recorded statement made to O'Bryant. Martin moved to exclude all evidence that would be "fruits of the poisonous tree" because the third statement led the Sheriff's Department to the body. The trial court denied the

12

motion because in the recorded statement, Martin made reference to taking the body and burying it in a shallow grave.

¶25. Continuing with testimony at the suppression hearing, the defense called Dr. Matherne to testify as to the specific testing performed in order to determine if Martin was competent to waive a *Miranda* warning. Dr. Matherne performed three tests, the Weschler Adult Intelligence Test-III (WAIS-III), the Wide Range Adaptive Test-III (WRAT-III) and a test developed by Dr. Thomas Grisso referred to as the "Assessing Understanding and Appreciation of Miranda Rights." Based on the results gleaned from these tests, Dr. Matherne determined that there were several words contained in the waiver of rights form that Martin did not understand. Although he did understand many of the other words, Dr. Matherne testified that Martin became confused during the questioning of his rights due to his limited intellect. Dr. Matherne further testified that in his professional opinion, Martin was "significantly compromised in his ability to adequately waive his Miranda rights." Dr. Matherne determined that Martin's IQ was 60; therefore, Martin would be extremely easy to confuse and would be highly susceptible to outside influence.

¶26. On cross-examination, Dr. Matherne explained that while Martin might understand all the words found in the sentences which make up the waiver form, when the words are actually put into sentence form, it requires a higher level of intellectual functioning to comprehend the meaning of the sentence.

13

¶27. After hearing testimony, the trial court determined that Martin's first two statements made to Zwick and O'Bryant were freely, voluntarily, intelligently and knowingly made. Therefore, the motion to suppress those two statements was denied. The trial court held that the statement made after the recorded statement would be excluded based upon violence exhibited toward the defendant.

¶28. The trial commenced on July 31, 2001 and before the jury was empaneled, Martin moved to preclude the State from offering any testimony regarding the body or the body being found in the septic tank because of the statements suppressed by trial court. Martin argued that the statement which was suppressed due to coercion informed the Sheriff's Department that the body could be found in the septic tank. After that statement was given, the body was discovered in the septic tank. The statement which was not suppressed only stated that the body had been buried in a shallow grave. The septic tank was not mentioned. The State argued that the trial court had previously ruled on this motion. However, the State further argued that although Martin had not mentioned a septic tank in the first statement, he did state that he had buried her in a shallow grave. The shallow grave turned out to be the septic tank which could not be accessed without digging. The trial court denied the motion because it found septic tank and shallow grave to be synonymous. The trial court stated that the information provided by Martin in the statement which was not suppressed would have allowed the Sheriff's Department to discover the body.

14

¶29.    "For a confession to be admissible, it must have been given voluntarily and not given as a result of promises, threats or inducements." ***Richardson v. State***, 722 So.2d 481, 487 (Miss. 1998) (citing ***Morgan v. State***, 681 So.2d 82, 86 (Miss. 1996); ***Chase v. State***, 645 So.2d 829, 837-38 (Miss. 1994); ***Layne v. State***, 542 So.2d 237, 240 (Miss. 1989)). In determining whether a statement is voluntary, the trial judge must first determine whether the accused, prior to the confession, understood the content and substance of the ***Miranda*** warning and the nature of the charges of which he was accused. ***Neal v. State***, 451 So.2d 743, 755 (Miss. 1984). Although this Court has repeatedly recognized that "an accused's intelligence level and mental abilities are an important factor to be considered in determining whether a confession has voluntarily been given," there are no per se rules against admitting the confession of a mentally challenged person. ***Id.*** at 756.

> [T]he mental abilities of an accused are a factor--but only one factor--to be considered. When all of the facts and circumstances of the particular confession and the interrogation leading up to it are considered--including the accused's abilities--the trial judge must find as a fact whether the confession was intelligently and voluntarily made. That fact finding will not be disturbed here unless we find it clearly erroneous.

***Id.***

> A confession will not ordinarily be excluded merely because the person making the confession is mentally weak. Until it is shown that a weak-minded person has been overreached to the end that he has divulged that which he would not have divulged had he not been overreached, his voluntary confession is admissible.

***Williamson v. State***, 330 So.2d 272, 276 (Miss. 1976).

15

¶30. "This Court will reverse a trial court's finding that a confession is admissible only when an incorrect legal standard was applied, manifest error was committed, or the decision is contrary to the overwhelming weight of the evidence." *Duplantis v. State*, 644 So.2d 1235, 1243 (Miss. 1994) (citing *Willie v. State*, 585 So.2d 660, 665 (Miss. 1991)). Therefore, after a thorough review of the record, we decline to hold that the trial court's finding regarding Martin's ability to voluntarily, knowingly and intelligently waive his rights and make two separate statements was clearly erroneous or against the overwhelming weight of the evidence. We further find that the trial court was correct in denying Martin's motion to preclude all mention of Crystal's body by applying the rationale that the Sheriff's Department would have discovered the body from the information given to them by Martin in his second statement which was admitted into evidence. We, therefore, find this issue is without merit.

### III. Miss. Code Ann. § 47-5-139(1)(a)

¶31. After being convicted of murder pursuant to Miss. Code Ann. § 97-3-19(1)(a) (Rev. 2000),[1] Martin was sentenced to serve a term of life imprisonment in the custody of the Mississippi Department of Corrections. Martin argues that the statute which governs when

---

[1] Miss. Code Ann. § 97-3-19 states in pertinent part:

(1) The killing of a human being without the authority of law by any means or in any manner shall be murder in the following cases:
    (a) When done with deliberate design to effect the death of the person killed, or of any human being. . . .

a party can be conditionally released from a life sentence, Miss. Code Ann. § 47-5-139 (Rev. 2000), violates his due process rights and equal protection rights because the statute makes an age-based distinction which lengthens a criminal sentence due to the age of an inmate. Miss. Code Ann. § 47-5-139 (Rev. 2000) states in pertinent part:

> (1) An inmate shall not be eligible for the earned time allowance if:
> (a) The inmate was sentenced to life imprisonment; but an inmate, except an inmate sentenced to life imprisonment for capital murder, who has reached the age of sixty-five (65) or older and who has served at least fifteen (15) years may petition the sentencing court for conditional release. . . .

¶32. Martin raised this issue before the trial court in his Motion for a New Trial, or, in the Alternative, a JNOV. Martin argued that the statutory scheme under which he was sentenced, Miss. Code Ann. § 47-5-139, was unconstitutional. Martin argued that since he was 27 years old at the time the crime was committed, he would be required to serve at least 35 years before becoming eligible to petition the trial court for conditional release; whereas, someone who was sentenced at the age of 50 would only have to serve 15 years before being given the opportunity to petition for conditional release. The trial court denied Martin's motion for a new trial, or in the alternative, a JNOV.

¶33. The State argues that Martin is serving a life sentence following a conviction of murder; therefore, Martin is not incarcerated by virtue of Miss. Code Ann. § 47-5-139. The State contends that this issue is not currently ripe for review on direct appeal of Martin's conviction and sentence. The State suggests the proper place for application of this statute would be Martin's petition for post-conviction relief. We agree. Additionally, the cases

17

cited by Martin are inapplicable to the issue before us today. Section 47-5-139 is not violative of Martin's due process and equal protection rights by specifying criteria to consider in determining which inmates may or may not be considered for earned time allowance. *See Irving v. Thigpen*, 732 F.2d 1215, 1217-18 (5th Cir. 1984); *Conley v. State*, 790 So.2d 773, 806 (Miss. 2001); *Harden v. State*, 547 So.2d 1150, 1152 (Miss. 1989). This issue is thus without merit.

## CONCLUSION

¶34. The trial court did not abuse its discretion in determining that Sam Ivan Martin was competent to stand trial nor in finding Martin voluntarily, knowingly and intelligently waived his rights prior to making two separate statements which were admissible into evidence. Additionally, Martin's sentence is not unconstitutional, either in its imposition or its effect under our sentencing and parole statutes. Accordingly, we affirm the judgment of the Circuit Court of Jackson County.

¶35. **CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.**

**SMITH, C.J., WALLER AND COBB, P.JJ., EASLEY, GRAVES AND DICKINSON, JJ., CONCUR. DIAZ, J., NOT PARTICIPATING.**

18