**IN THE SUPREME COURT OF MISSISSIPPI**

**NO. 2011-CT-00081-SCT**

*TYRELL WILLIAMS*

*v.*

*STATE OF MISSISSIPPI*

<u>**ON WRIT OF CERTIORARI**</u>

| | |
|---|---|
| DATE OF JUDGMENT: | 12/07/2010 |
| TRIAL JUDGE: | HON. CHARLES E. WEBSTER |
| COURT FROM WHICH APPEALED: | BOLIVAR COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF INDIGENT APPEALS |
| | BY: HUNTER NOLAN AIKENS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LADONNA C. HOLLAND |
| DISTRICT ATTORNEY: | BRENDA FAY MITCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 03/28/2013 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**COLEMAN, JUSTICE, FOR THE COURT:**

¶1.     Tyrell Williams was convicted of sexual battery and sentenced to twenty years in the custody of the Mississippi Department of Corrections (MDOC).  On appeal, Williams asserts he did not knowingly waive his constitutional rights, and the trial court therefore erred in denying his motion to suppress his inculpatory statement. Because the trial judge applied an incorrect legal standard at the suppression hearing, we reverse and remand for a new suppression hearing and a new trial.

**Factual Background and Procedural History**

¶2.     Tyrell Williams was charged with sexual battery of a thirteen-year-old-girl, Ann Smith.[1]  Williams was twenty-four years old at the time of the alleged incident.  Ann provided the following testimony: On January 30, 2009, Ann was walking home from school, and Williams called to her as she walked by his house. She went over to see what he wanted, and Williams forced her into the house, took her to a bedroom, locked the door, and forced her to have sexual intercourse and oral sex.  She testified that Williams had threatened to kill her if she told anyone, so initially she did not tell her mother what had happened.  Ann's mother testified that Ann was late coming home from school on the day of the incident, and she thought Ann was acting strangely.  After discovering that Ann's underwear was wet, she took her to the hospital.  Ann eventually told the nurse and her mother what happened.

¶3.     Williams was arrested for sexual battery.  Williams's mother testified that, when she learned of the arrest, she went to sheriff's department and spoke with the arresting officer, Jeff Joel.  She told Officer Joel that Williams was "sort of like mental incompetent" and asked if she could be in the room when Williams was questioned.  She testified that Officer Joel would not allow her in the room because Williams was over eighteen years old.  Officer Joel testified that he verbally advised Williams of his *Miranda* rights and gave him a written copy of his rights, which Williams signed, indicating that he understood and waived those rights.[2]  Officer Joel then took a recorded statement, and Williams confessed to sexual intercourse and oral sex with Ann.  Williams claimed Ann approached him and offered to

---

[1] We use a fictitious name to protect the identity of the victim.

[2] ***Miranda v. Arizona***, 384 U.S. 436, 475, 86 S. Ct. 1602, 1628, 16 L. Ed. 2d 694, 724 (1966).

have sex with him. He also claimed he asked Ann how old she was and that she said she was eighteen.

¶4. Williams filed a motion for mental examination, and the trial court granted the motion. Williams was examined first by Dr. Gilbert S. Macvaugh, who found that Williams had a full-scale IQ of 53 and that he was "functioning in the mildly mentally retarded range of intelligence." Dr. Macvaugh wrote that Williams "appear[ed] to be attempting to malinger symptoms of psychosis . . . [and] there was some indication that he may have been attempting to malinger memory and other cognitive deficits retrospectively (at the time of his statement to law enforcement)." Dr. Macvaugh was unable to opine "to a reasonable degree of medical certainty" whether Williams had the capacity to knowingly and intelligently waive his constitutional rights at the time of his confession. He recommended that Williams be evaluated further on an inpatient basis.

¶5. Williams was admitted to the Mississippi State Hospital and observed for two months. After that time, Drs. Robert McMichael and Amanda L. Gugliano issued a report, in which they concluded that Williams was competent to stand trial and had "the capacity presently to understand and knowingly, intelligently, and voluntarily to waive or assert his constitutional rights." However, like Dr. Macvaugh, they could not say whether Williams had the capacity to waive or assert his rights at the time of his confession.

¶6. Williams moved to suppress the statement he had made to Officer Joel, and the trial court held a suppression hearing. Williams's mother testified that Williams had received a disability check since age five or six, and that she had taken him to see mental health workers on a regular basis since he was five years old. She testified that Williams was in special

3

education throughout school, he did not graduate high school, and he was not able to drive, work, or live alone.

¶7. Officer Joel also testified at the suppression hearing. Officer Joel testified that his general practice for a suspect interview was to inform the person of the charges against them and to explain what would be discussed. He would then "go over the rights form with them, explain them [the rights] step by step, ask for questions if [they] are not understanding, [and] explain to them how the interview process is going to work." Then he would start the tape recorder, "read their rights to them again[,] and ask that a verbal acknowledgment be stated after each right." Williams signed the "rights form" indicating he had been verbally advised of his *Miranda* rights and waived those rights. Officer Joel testified that he believed Williams understood his rights. He said Williams's answers were responsive, he was not hesitant in responding, he provided extreme detail about the incident, and he even corrected Officer Joel's misstatement of the facts. Williams raised the issue of Ann's age without being asked or prompted, and at the end of the interview, Williams said he should not have talked to Officer Joel and that he was in trouble now.

¶8. After considering the testimony and the evidence, the trial judge denied Williams's motion to suppress. He did not enter an order or findings of fact and conclusions of law pertaining to this ruling, but he discussed his findings on the record at the hearing. The judge reviewed the reports from the Mississippi State Hospital doctors and summarized their findings as follows:

> [T]hey are unanimous in their opinion that Mr. Williams does have the sufficient present ability to consult with an attorney with a reasonable degree of rational understanding in the preparation of his defense, and that he has a

4

rational as well as a factual understanding of the nature and the object of the legal proceedings against him; that they are also unanimous in their opinion that he has the capacity presently to understand and knowingly, intelligently, and voluntarily to waive or assert his constitutional rights[,] particularly his right not to incriminate himself and his right to a trial; and then thirdly, they say, "We are unable to form an opinion regarding whether or not Mr. Williams had this capacity at the time of his statement to authorities."

The judge concluded that, because the doctors were unable to form an opinion as to whether Williams was able to understand and knowingly waive his rights, then it fell to the court to make that decision.

¶9.     In addition to the doctors' reports, the judge heard testimony from two fact witnesses, and he found Officer Joel's testimony to be credible. Regarding Williams's statement to Officer Joel, the judge said:

I have looked at the statement that was given. The statement certainly, as defense counsel stated it would, appears to be rational responses to questions that are asked. There's nothing in the statement that jumps off the page at you to suggest that Mr. Williams did not understand what was going on at the time, did not understand what he was being questioned about. His responses are appropriate, given the content of the questions. So the State is correct that it was . . . Mr. Williams that pointed out the -- about asking about the age of the girl or -- "I asked her how old she was. She said she was about 18." That was an unsolicited response or unsolicited information which seems to -- or would seem to suggest some level of understanding on his part as to the nature of the proceedings, the fact that the girl being -- or the age of 18 being significant, I think, in a case such as this.

The judge also thought Williams's statements at the end of the interview – that he should not have talked and that he was in trouble now – suggested an understanding of the nature of the proceedings. The judge was concerned with Williams's low IQ but noted that it is just one factor to consider "in assessing whether or not he would have a genuine understanding or sufficient understanding of his rights."

5

¶10. Ultimately, the trial judge concluded: "[B]ased on the evidence I have in front of me, I cannot rule that he did not understand his rights as they were stated to him by Jeff Joel. Therefore, I'm not going to suppress the statement." The case proceeded to trial, and Officer Joel was allowed to testify regarding Williams's statement. The jury found Williams guilty of sexual battery, and the judge sentenced him to twenty years in the custody of the MDOC. Williams appealed, and the Court of Appeals affirmed. *Williams v. State*, 2011-KA-00081-COA, 2012 WL 1003468 (Miss. Ct. App. Mar. 27, 2012). We granted Williams's petition for writ of certiorari.

**Discussion**

¶11. The only issue on appeal is whether the trial court erred in denying Williams's motion to suppress the statement he made to law enforcement officials. "This Court will reverse a trial court's finding that a confession is admissible only when an incorrect legal standard was applied, manifest error was committed, or the decision is contrary to the overwhelming weight of the evidence." *Martin v. State*, 871 So. 2d 693, 701 (¶ 30) (Miss. 2004) (quoting *Duplantis v. State*, 644 So. 2d 1235, 1243 (Miss. 1994)). Determining whether the trial judge applied the correct legal standard involves a determination that the correct burden of proof was applied. *Neal v. State*, 451 So. 2d 743, 753 (Miss. 1984) (citations omitted).

¶12. We repeatedly have held that when the admissibility of a confession is challenged, the "State has the burden of proving voluntariness of the confession and it must be proved beyond a reasonable doubt." *Jones v. State*, 841 So. 2d 115, 130 (¶ 38) (Miss. 2003) (citing *Mettetal v. State*, 602 So. 2d 864, 868 (Miss. 1992); *Neal*, 451 So. 2d at 753). In addition to a confession being voluntary, waiver of one's rights in making that confession must be

6

knowing and intelligent. "When an accused makes an in-custody inculpatory statement without the advice or presence of counsel, even though warnings and advice regarding his privilege against self-incrimination have been fully and fairly given, the State shoulders a heavy burden to show a knowing and intelligent waiver." *Neal*, 451 So. 2d at 753 (citing *Fare v. Michael C.*, 442 U.S. 707, 724, 99 S. Ct. 2560, 2571, 61 L. Ed. 2d 197, 212 (1979); *Miranda*, 384 U.S. at 475, 86 S. Ct. at 1628; *Abston v. State*, 361 So. 2d 1384, 1391 (Miss. 1978)).

¶13. Where the issue of mental retardation is raised, as it is here, "the trial judge must first determine whether the accused, prior to the confession, understood the content and substance of the *Miranda* warning and the nature of the charges of which he was accused." *Martin*, 871 So. 2d at 701 (¶ 29) (citing *Neal*, 451 So. 2d at 755). We have held that "mild mental retardation of the defendant does not render a confession *per se* involuntary; rather, the defendant's mental abilities are but one factor to be considered." *Harden v. State*, 59 So. 3d 594, 605 (Miss. 2011) (citing *Neal*, 451 So. 2d at 756). The court must consider the totality of the circumstances to determine whether a knowing and voluntary waiver has occurred. *Smith v. State*, 534 So. 2d 194, 197 (Miss. 1988).

¶14. "When all of the facts and circumstances of the particular confession and the interrogation leading up to it are considered – including the accused's abilities – the trial judge must find as a fact whether the confession was intelligently and voluntarily made." *Neal*, 451 So. 2d at 756. Again, the State bears the burden of proving beyond a reasonable doubt that the defendant made a knowing and intelligent waiver of his rights and that his confession was voluntary. *Jones*, 841 So. 2d at 130 (¶ 38); *Neal*, 451 So. 2d at 753. When

7

the trial judge applies the correct legal standard and considers the totality of the circumstances surrounding the confession, the trial judge's fact finding on "whether the confession was intelligently and voluntarily . . . will not be disturbed unless we find it clearly erroneous." *Neal*, 451 So. 2d at 756. However, where the trial court applies an incorrect legal standard, we must reverse. *Duplantis*, 644 So. 2d at 1243-44.

¶15.    At the end of the suppression hearing, the trial judge concluded: "I cannot rule that [Williams] did not understand his rights as they were stated to him by Jeff Joel. Therefore, I'm not going to suppress the statement." In so finding, the trial judge reversed the applicable standard and improperly placed the burden on the defendant to prove that he did *not* understand his rights. The burden was on the State to prove beyond a reasonable doubt that Williams *did* understand his rights and that he made a knowing, intelligent, and voluntary confession. Because the trial judge articulated an incorrect legal standard, we reverse and remand the matter for a new trial. Prior to the trial, the judge should hold a new suppression hearing and apply the standards set forth herein. Further, because the Court of Appeals erroneously held that the trial judge applied the correct legal standard, the judgment of the Court of Appeals also is reversed.

## Conclusion

¶16.    The trial judge applied an incorrect legal standard by shifting the burden of proof to the defendant. Therefore, the judgments of the Court of Appeals and of the Circuit Court of Bolivar County, Second Judicial District, are reversed, and the case is remanded for a new suppression hearing and a new trial.

¶17.    **REVERSED AND REMANDED.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., LAMAR AND PIERCE, JJ., CONCUR. CHANDLER, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS AND KING, JJ. KING, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS AND CHANDLER, JJ.**

**CHANDLER, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART**:

¶ 18. I write separately to express my concerns about Williams's ability to knowingly, intelligently, and voluntarily waive his *Miranda*[3] rights. A waiver is an intentional relinquishment of a *known* right or privilege. *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019, 1023, 82 L. Ed. 1461 (1938) (emphasis added). We must "'indulge every reasonable presumption against waiver' of fundamental constitutional rights and . . . we 'do not presume acquiescence in the loss of fundamental rights.'" *Id.* (citations omitted). The prosecution bears the heavy burden of proving beyond a reasonable doubt that a waiver was knowing, voluntary, and intelligent. *Jordan v. State*, 995 So. 2d 94, 106 (Miss. 2008).

¶19. For a waiver to be knowing and intelligent, it must be "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421,106 S. Ct. 1135, 1141, 89 L. Ed. 2d 410 (1986). According to the tests administered by Gilbert S. Macvaugh, Williams had an IQ of 53, which is three standard deviations below the mean. He had a verbal IQ score of 55, in the "extremely low" range. Dr. Macvaugh reported that Williams's verbal IQ score places him in the lowest one tenth of one percent of the population.

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

¶20. According to the Diagnostic and Statistical Manual of Mental Disorders, a person with an IQ score of 50-55 is within the score range of moderate mental retardation or mild mental retardation. Dr. Macvaugh noted that Williams had scored in the "upper moderate to lower mild range of mental retardation." According to the DSM-IV,

> Moderate mental retardation is roughly equivalent to what used to be referred to as the educational category of 'trainable.' . . . Most of the individuals with this level of mental retardation acquire communication skills during early childhood years. They profit from vocational training and, with moderate supervision, can attend to their personal care. They can also benefit from training in social and occupational skills *but are unlikely to progress beyond the second-grade level in academic subjects. . . .*

American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 41 (4th ed. 1994) (emphasis added). An adult moderately mentally retarded person has "a mental age of 6 to 8 years." John W. Jacobson and James A. Mulick, *Manual of Diagnosis and Professional Practice in Mental Retardation* 18 (1996). These individuals "generally have functional language, although their intelligibility may be poor, but reading and money, or numbers, skills are typically not functional, and some supervision of self-care may be necessary." *Id.* For these individuals, "adult independence typically is not achieved;" usually, they must reside with relatives or in an out-of-home care setting. ***Id.***

¶21. This is consistent with Dr. Macvaugh's findings regarding Williams. His sentence-comprehension was at the third-grade level. His "general fund of knowledge appeared impoverished." Williams could not spell the word "world." He did not know the meaning of common sayings like "one cannot judge a book by its cover" and "there is no use crying over spilled milk." His only job lasted for two months, he has never lived independently, and he has received a disability check since he was four or five years old. His mother manages his

10

finances and does his grocery shopping. His mother reported that he "is a pleaser of authority . . . easy to be influenced, he will agree with you if you don't get mad at him." Dr. Macvaugh had difficulty teaching Williams abstract concepts, such as the plea-bargaining process. In fact, Williams was found competent to stand trial only after two months of training, after which the psychologist concluded that "complex legal concepts will need to be explained to him in simple language."

¶22.	Regarding the characteristics of mentally challenged individuals in the criminal justice system, it has been said that

> Many mentally retarded people have limited communication skills. The most seriously disabled persons have no expressive language and limited or no receptive language. Therefore, it would not be unusual for a mentally retarded individual to be unresponsive to a police officer or other authority or to be able to provide only garbled or confused responses when questioned. Even when the mentally retarded person's language and communication abilities appear to be normal, the questioner should give extra attention to determining whether the answers are reliable. Several factors can influence the reliability of an answer. For example, many people with mental retardation are predisposed to "biased responding" or answering in the affirmative questions regarding behaviors they believe are desirable, and answering in the negative questions concerning behaviors they believe are prohibited. The form of a question can also directly affect the likelihood of receiving a biased response, and thus police officers, judges, and lawyers may inadvertently or intentionally cause the susceptible mentally retarded accused person to answer in an inaccurate manner by asking a question in an inappropriate form.

James W. Ellis and Ruth A. Luckasson, *Mentally Retarded Criminal Defendants*, 53 Geo. Wash. L. Rev. 414, 428 (1985).

¶23.	When Officer Joel administered the ***Miranda*** warnings, he made no effort to explain the warnings to Williams. Although Joel testified that Williams appeared to understand the warnings and responded affirmatively to Joel's questions, those facts do not necessarily

signify that Williams waived his rights "with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it" as required to satisfy the Fifth Amendment. There is a serious danger that Williams responded affirmatively in order to please Joel without any meaningful conception of the rights he waived in doing so. For these reasons, I believe the State fell woefully short of proving that Williams knowingly and intelligently waived his rights.

¶24. Requiring that the trial judge hold another suppression hearing on remand will do nothing to cure the lack of proof supporting the admission of Williams's statement. While I concur with the majority's finding that the trial court applied the incorrect legal standard, I dissent to their ordering another suppression hearing. I would reverse the trial court's decision admitting Williams's statement and remand for a new trial in which the statement is not placed into evidence.

**KITCHENS AND KING, JJ., JOIN THIS OPINION.**

**KING, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶25. I agree that the trial court applied the wrong standard and impermissibly placed the burden of proof on Williams to establish that his statement was not the product of a voluntary, knowing and intelligent waiver of his ***Miranda***[4] rights. The impermissible shifting of the burden of proof was manifest error, and the resulting decision to admit Williams's statement was not supported by the evidence.

---

[4]***Miranda v. Arizona***, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

¶26.	Tyrell Williams is mentally retarded. His IQ is 53. He functions on a second-or third-grade level in all academic areas. He did not graduate from high school, and he participated in special education during his formal schooling. He has received disability benefits for mental incompetence since a very young age. While he can perform some basic household duties, he is unable to perform many simple tasks, such as going to the grocery store. He does not have a driver's license, and his longest period of continuous employment was approximately two months. Williams also has a history of receiving both inpatient and outpatient mental health services for mental illness and substance abuse. Prior to the incident at hand, Williams had no prior felony arrests or convictions.

¶27.	On January 30, 2009, Williams allegedly had sexual intercourse with then-thirteen-year-old Ann Smith. Several months later, Officer Jeff Joel arrested Williams in conjunction with this incident and transported him to the Bolivar County Sheriff's Department.[5] Williams's mother testified that, upon learning of Williams's arrest, she went to the Sheriff's Department and explained to Officer Joel that Williams was mentally incompetent. Before beginning his interrogation, Officer Joel informed Williams of his *Miranda* rights. When Officer Joel read Williams his rights, Williams responded "Okay" to each of the rights. When asked if he understood his rights, Williams merely stated "Yes, sir." No additional precautions were taken to ensure that Williams understood his rights, despite Officer Joel's

---

[5]The record contains some perplexing inconsistencies. Officer Joel testified that the rape kit "was submitted in February after Mr. Williams' arrest" because Williams gave a blood sample, and law enforcement requested that the crime lab compare Williams's DNA with any DNA found in the rape kit. However, elsewhere in the record, it appears that Williams was not arrested and interrogated until the end of July, approximately six months after the alleged incident.

knowledge of Williams's mental deficiencies. Williams subsequently made a statement admitting that he had sexual intercourse with Ann Smith, but stating that she told him that she was eighteen, which he believed.

¶28. Williams was indicted for the crime of sexual battery. On October 15, 2009, Williams's counsel filed a Motion for Mental Examination to determine Williams's competence. He further declared that it was very difficult to adequately prepare a defense due to Williams's mental incompetence. The court granted the motion and ordered that Williams be evaluated to determine competence, including his capacity to knowingly, intelligently, and voluntarily waive or assert his constitutional rights.

¶29. On March 17, 2010, Williams was evaluated by Dr. Gilbert Macvaugh. Dr. Macvaugh issued a thorough eighteen-page report. He determined that Williams's full-scale IQ was 53, that he functioned on a second- or third-grade level, and that overall, his comprehension was extremely impaired. He concluded that the evaluation suggested that Williams may have

> deficits in his capacity to make a knowing and intelligent waiver of his right to silence and his right to legal counsel at the time of his statement to law enforcement, particularly in light of his severely low IQ and limited reading comprehension skills . . . . In my opinion, it is unlikely that a defendant with an IQ in the low 50s and reading comprehension skills at the second to third grade level would be capable of making a competent waiver of these rights.

Dr. Macvaugh did note that Williams

> appeared to have at least some basic familiarity with these rights and was able to spontaneously recite some of the standard wording. However, his actual understanding of these rights, i.e., comprehension of the terms and phrases used in the *Miranda* warnings; appreciation of the role of defense counsel in that situation, etc., appeared rather limited because of his intellectual disability

14

and his lack of experience in these situations (as evidenced by his confusion regarding the terms "appeal" and "appoint").

However, because Dr. Macvaugh was concerned that Williams may have been attempting to retrospectively malinger memory deficits for his statement to law enforcement, Dr. Macvaugh determined that he was unable to form an opinion to a reasonable degree of certainty regarding Williams's ability to knowingly and intelligently waive his *Miranda* rights. Dr. Macvaugh thus recommended that Williams be evaluated on an inpatient basis at the Mississippi State Hospital at Whitfield.

¶30. Williams spent nearly two months at the State Hospital, receiving inpatient observation. During this time, the State Hospital taught Williams about criminal court proceedings, particularly through his work with the Court Competence Assessment Group. At the end of his stay, Drs. McMichael and Gugliano issued a four-page "summary report." The summary report stated that Williams "is mentally retarded." The report noted that when Williams was first admitted, he

> did not appear to appreciate the importance of his understanding criminal court proceedings. Over the course of this hospitalization, however, he has appeared to make more of an effort to learn this material. He then appeared to have memorized the basic facts of criminal court proceedings, but still could not apply these in hypothetical situation.

By the time of his final interview, Williams "demonstrated the ability to apply the information he had learned in the Court Competence Assessment Group to a variety of hypothetical situations." The report concluded that Williams had the present capacity to knowingly and intelligently waive or assert his constitutional rights, but stated that the doctors "were unable to form an opinion regarding whether or not Mr. Williams had this

15

capacity at the time of his statements to authorities." The report further qualified that Williams could "understand his legal situation and confer rationally with his counsel" only if "[c]omplex legal concepts [are] explained to him in simple language."

¶31. After Williams's time in the State Hospital, his counsel filed a Motion to Determine Ability to Stand Trial in which he maintained that, notwithstanding the doctors' conclusions otherwise, Williams's mental retardation made him unable to assist his attorney in preparing for trial. On December 2, 2010, the trial court held a hearing on this motion, as well as on the oral motion to suppress Williams's statement to Officer Joel. Williams argued that his statement should be suppressed on the basis that his *Miranda* waiver was not knowing and intelligent. Williams's mother testified regarding his inability to understand his *Miranda* rights. Officer Joel testified that Williams seemed to understand the rights that he was waiving. The trial court found Williams competent to stand trial based on the doctors' opinions. The court then noted that Officer Joel's testimony was that Williams had an understanding of his rights, and he noted that in his statement, Williams's answers to Officer Joel's questions and his statement at the very end of the interview that he should not have talked to Officer Joel and that he was in trouble showed an understanding of the nature of the proceedings in which he was engaged.[6] The judge stated that "based on the evidence that I have in front of me, I cannot rule that he did not understand his rights as they were stated to him by Jeff Joel." Thus, the trial court denied Williams's motion to suppress his statement.

---

[6]As noted by the majority, the trial court placed much emphasis on the fact that Williams's answers to Officer Joel's questions regarding the incident were responsive. However, responses to questions regarding a specific event (i.e., the alleged assault) do not evince comprehension of the complex legal concept of waiving one's *Miranda* rights.

16

¶32. The Fifth Amendment to the United States Constitution provides that, in a criminal case, no person shall be compelled to be a witness against himself. U.S. Const. amend. V.[7] Thus, in *Miranda*, the United States Supreme Court created procedural safeguards to protect the Fifth Amendment right to silence. *Colorado v. Spring*, 479 U.S. 564, 572, 107 S. Ct. 851, 93 L. Ed. 2d 954 (1987) (citing *Miranda*, 384 U.S. 436).

¶33. "[A] suspect may waive his Fifth Amendment privilege, provided the waiver is made voluntarily, knowingly and intelligently." *Spring*, 479 U.S. at 573 (internal quotations omitted). "The inquiry whether a waiver is coerced has two distinct dimensions." *Id.* at 573. First, the waiver must be voluntary, in that it must be a choice made freely and deliberately, without intimidation, coercion, or deception. *Id.* Second, the waiver must be knowing and intelligent, thus "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* (quoting *Moran v. Burbine*, 475 U.S. 412, 421, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986)). Courts must examine the totality of the circumstances to determine if the "requisite level of comprehension" exists. *Spring*, 479 U.S. at 573.

¶34. The prosecution bears the burden of proving beyond a reasonable doubt that a statement was given after a valid waiver. *Jordan v. State*, 995 So. 2d 94, 106 (Miss. 2008). The determination of whether a defendant's rights were waived voluntarily, knowingly, and intelligently is a mixed issue of law and fact. *Id.* "Therefore, this Court will not reverse a

---

[7]The Mississippi Constitution similarly provides that, in a criminal prosecution, no person shall be compelled to give evidence against himself. Miss. Const. art. 3, § 26.

trial court's findings if they were based on appropriate principles of law and supported by substantial evidence." *Id.*

¶35. While I agree with the majority that the trial court applied the incorrect legal standard, I believe that, even under the correct legal standard, the State utterly failed to meet its burden of proof. The State should not get a second bite at the apple after its complete failure to meet its burden of proof, and Williams's confession should be suppressed. The substantial evidence leads to the conclusion that the State did not prove beyond a reasonable doubt that Williams validly waived his constitutional rights, as his mental deficiencies prevented him from knowingly and intelligently waiving those rights. Only after two months of inpatient care focused on learning about the court system in the Court Competence Assessment Group at the State Hospital were state doctors able to declare Williams competent to stand trial. Even then, none of the three doctors who evaluated him could state that Williams was competent to waive his *Miranda* rights at the time that he did. The State Hospital doctors even noted that his understanding of the legal system was limited when he was admitted, and further opined that, due to his disability, he would be able to understand his legal situation only if complex legal concepts were explained in simple language. There is no evidence that Officer Joel explained Williams's *Miranda* rights to him in simple language, despite Williams's mother informing Officer Joel that Williams was mentally incompetent. Further, Dr. Macvaugh expressed serious concerns that someone of Williams's mental capacity could knowingly and intelligently comprehend and waive his *Miranda* rights. Williams's mother also testified as to her son's mental deficiencies and his reliance on her to understand basic concepts. The only evidence that Williams knowingly and intelligently waived his *Miranda*

18

rights was the testimony of Officer Joel that Williams understood his rights and answered his questions regarding the incident.[8] This scant proof in the face of the abundant evidence of Williams's mental deficiencies cannot meet the State's burden of proof.

¶36.     The evidence mandates the conclusion that Williams's statement was made *without* "a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it" due to his mental deficiency. *See **Dover v. State***, 227 So. 2d 296 (Miss. 1969) (suppressing a confession made by a defendant with an IQ of 60, and stating that "we are not prepared to state that a mentally deficient person of the caliber shown here can knowingly and effectively waive his constitutional rights"); ***Harvey v. State***, 207 So. 2d 108 (Miss. 1968) (suppressing a confession made by a defendant with an IQ of 60). His IQ of 53 and his ability to function only at the level of a second- or third-grader, the fact that three doctors were unable to say that he comprehended the nature of his waiver, the fact that he could be declared competent to stand trial and to prepare a defense only after months of inpatient work in the State Hospital learning about the court system, combined with the fact that he was only found to be competent if complex legal concepts were explained in simple terms (something that was not done during his interrogation) establish that the State failed to prove beyond a reasonable doubt that Williams's waiver of his ***Miranda*** rights was knowing and intelligent. Thus, the decision of the trial court to admit Williams's confession was not supported by substantial evidence.

---

[8]As noted, *infra*, the ability to answer direct questions regarding an event and the ability to comprehend the nature of constitutional rights are two horses of a different color.

¶37. Accordingly, I would reverse the trial court's decision to admit Williams's confession and the Court of Appeals decision affirming that judgment, and remand the case for a new trial in which the confession is suppressed. The State failed to meet its burden of proof. I cannot agree that the State should now receive a second chance to prove that which it did not prove in the first instance.

**KITCHENS AND CHANDLER, JJ., JOIN THIS OPINION.**